**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-24416-BLOOM/Elfenbein**

ON, INC.,

      Plaintiff,

v.

CARIBBEAN SPORTS DISTRIBUTOR LLC
and DOES 1–10, inclusive,

      Defendants.

_____/

**<u>ORDER ON MOTIONS TO DISMISS</u>**

      **THIS CAUSE** is before the Court upon Defendant Caribbean Sports Distributor LLC's ("CSD") Motion to Dismiss First Amended Complaint ("Motion to Dismiss the Complaint"), ECF No. [31]. Plaintiff On, Inc. ("On") filed a Response in Opposition, ECF No. [32], to which CSD filed a Reply, ECF No. [33]. Also before the Court is On's Motion to Dismiss Defendant Caribbean Sports Distributor LLC's Counterclaims, ECF No. [36] ("Motion to Dismiss the Counterclaim"). CSD filed a Response in Opposition, ECF No. [37], and On filed a Reply, ECF No. [40]. The Court has reviewed the Motion to Dismiss the Complaint and Motion to Dismiss the Counterclaim, the supporting and opposing submissions, the record, and is otherwise fully advised. For the reasons that follow, the Motion to Dismiss the Complaint is granted in part and denied in part, and the Motion to Dismiss the Counterclaim is denied.

## I.     BACKGROUND

### A.     Background of On's Complaint

On is a manufacturer of footwear, apparel, and accessories for use in running, outdoor activities, training, all-day activities, and tennis. ECF No. [25] ¶ 4. On or around May 15, 2015, On entered into a business relationship with CSD pursuant to which CSD was to serve as a distributor of On-branded shoes, selling those products within Puerto Rico. *Id.* ¶ 16. CSD acted exclusively as an official distributor of On's shoes in Puerto Rico; it did not "own, design, create, manufacture, or otherwise develop any of On's products." *Id*.

Under the parties' business relationship, CSD would place orders for inventory from On at discounted or wholesale prices, then sell those On-branded shoes at a premium in Puerto Rico. *Id.* 17. Most of the time, when CSD placed an order for inventory, On would issue an invoice to CSD for payment. *Id*.

Between May 15, 2015 and June 30, 2023—when On terminated the business relationship between the parties and stopped fulfilling CSD's orders—"CSD sold an increasing number of On-branded shoes in Puerto Rico each year as the market for On-branded shoes grew naturally with the increasing popularity of On worldwide." *Id.* ¶ 18. Neither the unexecuted Terms of Service—which On alleges was the general blueprint that the parties' agreement followed—nor the parties' business relationship or course of conduct "contemplated that CSD would share in On's revenue or profits from sales in Puerto Rico, or that it would be compensated in any other manner." *Id.* ¶ 20. The entire business relationship and compensation structure was premised on CSD placing inventory orders from On and On issuing invoices to CSD for those inventory purchases. *Id*.

As an official distributor of On products in Puerto Rico, CSD maintained a list of active retail accounts to whom it sold On-branded shoes (the "List"). *Id.* ¶ 21. In May 2021, On requested

2

the CSD provide it with the List so that On "could undertake brand integrity management and oversight, and vendor screening and related due diligence, all of which was for legitimate commercial purposes and lawful business reasons." *Id.* ¶ 22. Despite On's repeated requests, CSD did not provide On with the List until December 2021. *Id.* ¶ 23. After CSD provided the List, On performed an audit on the List and discovered (i) that many of the "active" accounts were not, in fact, active and (ii) that CSD had failed to disclose numerous active accounts. *Id.* ¶ 24. Nonetheless, On continued to conduct business with CSD until June 30, 2023. *Id.* ¶ 25.

On January 1, 2023, On terminated its business relationship with CSD. *Id.* ¶ 26. Still, it provided CSD with a six-month "grace period" running until June 30, 2023, during which time the parties continued to transact. *Id.* On decided to terminate the business relationship because— consistent with its broader North American sales approach—it was transitioning from a distributor model to an in-house model for service of Puerto Rico. *Id.* This would enable On to "control distribution, take control of dealer approval and distribution, control the amount of product delivered, including to Puerto Rico, and approve assortments by channel." *Id.*

In its termination notice, On representative Dan Schade addressed the grace period during which CSD could place orders for On products. *Id.* ¶ 27. He explained, "We, however, remain committed to taking and fulfilling your orders through June 30, 2023. Our payment terms for any orders remain 90 days dating per date of invoice." *Id.*

Approximately two weeks before On issued its written termination notice to CSD, On representatives verbally informed CSD of its intent to unwind the parties' distributor relationship. *Id.* ¶ 28. During that call, On explained the reasons for and mechanics of the termination. *Id.*

> On further confirmed during that call that all CSD following-season preorders for the Spring 2023 season would be shipped subject to product availability and CSD's timely payment of outstanding invoices, consistent with On's standard credit practices. On also advised CSD that it would be permitted to place reorders during

> the Spring season only if CSD was current on its outstanding payables, and that no orders would be released while CSD remained delinquent. During the same call, On expressly advised CSD that it would be allowed to return unsold inventory prior to the due date of the final invoice, and that any returned goods would be processed as returns-to-vendor and credited against CSD's outstanding invoice balances in a commensurate amount.

*Id*.

Throughout the Spring 2023 season that followed, "CSD was repeatedly placed on credit hold due to its failure to timely satisfy outstanding invoice obligations." *Id.* ¶ 29. In accordance with its "standard credit and risk-management practices," On "consistently held CSD's orders" pending receipt of payments that CSD repeatedly promised. *Id.* During this time, CSD repeatedly represented to On that inventory returns were pending and that payments were forthcoming, urging On to release additional orders in reliance on those representations. *Id*.

In those communications with On, CSD "expressly acknowledged that CSD was over its credit limit and not current on its payables, but nonetheless requested that On release inventory based on personal assurances and commitments that CSD would pay its outstanding balance in full." *Id.* ¶ 30. On therefore released inventory to CSD during the Spring 2023 season. *Id*. Still, CSD "failed to satisfy its payment obligations, remained over its credit limit, and continued to seek the release of additional orders while advising On that payments and inventory returns were 'pending.'" *Id*.

In May 2023, when CSD notified its On accounts that its distributor relationship with On was ending, many of those accounts reached out to On directly to learn more about how they could continue to receive On products. *Id.* ¶ 31. On informed each that they should continue to work with CSD until June 30, 2023 and that On would not have any business discussions with them until July 1, 2023. *Id*.

Around July 1, 2023, the end of the grace period, CSD owed On approximately $400,000 for inventory provided under processed purchase orders. *Id.* ¶ 33. On June 21, 2023, a CSD representative assured an On representative that CSD would "pay every last penny owed to On." *Id*. For several months thereafter, CSD "made numerous payments to On for inventory that it purchased during the Parties implied-in-fact contractual period (including the grace period through June 30, 2023), in order to satisfy its outstanding debt, and repeatedly committed to paying amounts that remain due under the outstanding Invoices." *Id.* ¶ 34. For example, on March 4, 2024, a CSD representative apologized to On "for any inconvenience caused by the delay in payment." *Id*. Since then, "CSD has wholly failed to satisfy its remaining financial obligation to On under the outstanding Invoices, in the current aggregate amount of $166,622.04 in unpaid On inventory that CSD continues to wrongfully possess." *Id.* ¶ 36. On was eventually forced to engage a collections agency. *Id.* ¶ 38.

In April 2025, nearly two years after the expiration of the grace period—CSD reached out to On demanding that On pay CSD millions of dollars. *Id.* ¶ 38. CSD primarily argued that "(1) it is entitled to a share of On's revenue in Puerto Rico based on the fact that it sold On's products for years there and purportedly developed brand recognition and goodwill; and (2) it should be compensated for the inaccurate List that CSD created, which contained accounts to which On purportedly continues to do business." *Id*.

On September 24, 2025, On filed the present action against CSD. ECF No. [1]. On January 5, 2026, On filed its First Amended Complaint, asserting claims of (i) Breach of Implied-in-Fact Contract against CSD (Count I), (ii) in the alternative, Account Stated against CSD (Count II), (iii) in the alternative, Conversion against CSD and Does 1–10 (Count III), and (iv) in the alternative, Unjust Enrichment against CSD (Count IV). ECF No. [25].

CSD's Motion to Dismiss the Complaint seeks dismissal of all claims for relief contained in On's First Amended Complaint, arguing that all Counts fail to state a claim and should be dismissed with prejudice. ECF No. [31]. On responds that the arguments contained in CSD's Motion to Dismiss the Complaint "all fail under Florida case law," and thus, CSD's Motion to Dismiss the Complaint should be denied. ECF No. [32].

### B.      Background of CSD's Counterclaim

On is a "performance footwear and apparel company." ECF No. [34] ¶ 21. In early 2014, discussions began between On and CSD regarding distribution of On products in Puerto Rico. *Id.* ¶ 22. At the time, On remained a relatively young brand, so it relied on regional distributors to develop its international presence in untapped markets. *Id.* ¶ 23. Puerto Rico was one such market. *Id.* ¶ 24.

In February 2014, On's co-founder expressly authorized CSD to sell On products in Puerto Rico. *Id.* ¶ 25. On was aware that Puerto Rico would be served by CSD, and CSD became On's "authorized and exclusive distributor in Puerto Rico." *Id.* ¶¶ 26, 27.

In May 2015, On restructured logistics so that CSD would be supplied inventory directly from On's United States warehouse. *Id.* ¶ 28. On confirmed in writing that CSD would receive products directly from the United States warehouse and that Puerto Rico would no longer be served via Mexico. *Id.* ¶ 29. On opened CSD as an account within its United States ordering system, thereby establishing an ongoing commercial supply channel. *Id.* ¶ 30. From then on, CSD "functioned as On's exclusive distributor for Puerto Rico," serving as the sole entity responsible for distributing On's products to retailers within the territory. *Id.* ¶ 31. At no point during the parties' relationship did On appoint any other distributors in Puerto Rico; it relied exclusively on CSD to supply retailers within Puerto Rico. *Id.* ¶ 33.

During the parties' relationship, "CSD expended significant time and resources establishing On's presence in Puerto Rico through the distribution and marketing of On's products." *Id.* ¶ 35. For instance, CSD developed specialty running accounts, built triathlon and multisport retail relationships, sponsored regional athletes, conducted in-store merchandising, and attended endurance events. *Id.* ¶ 36. In doing so, "CSD built a robust retailer network across Puerto Rico, resulting in millions of dollars in annual revenue generated for On through sales within that market." *Id.* ¶ 37. For example, in 2015, CSD purchased 1,086 units from On for distribution in Puerto Rico, yielding $70,590 in revenue for On. *Id.* ¶ 38. By 2021, CSD purchased 57,097 units from On for Puerto Rican distribution, resulting in On receiving $4,282,275. *Id.* ¶ 39.

Near the end of 2021, CSD "learned that On had begun directly supplying product to Foot Locker locations in Puerto Rico without prior notice to CSD and while CSD was serving as On's exclusive distributor in the territory." *Id.* ¶ 44. These direct sales to Foot Locker occurred within the Puerto Rico territory assigned to CSD. *Id.* ¶ 46. Certain of On's regional representatives were unaware of the decision to supply some Puerto Rican retailers directly, as the decision was made at the corporate level. *Id.* ¶ 47.

In December 2021, On informed CSD that it required access to CSD's retailer list—a list curated by CSD of Puerto Rican retailers who purchased on products from CSD. *Id.* ¶¶ 49, 51. On represented that it needed access to the retailer list "for inventory allocation and continued coordination of distribution within the territory." *Id.* ¶ 52. In May 2022, On renewed its request for the retailer list. *Id.* ¶ 53. At the time On made these requests for the retail list, "CSD was experiencing inventory caps, blocked deliveries, and system holds imposed by On." *Id.* ¶ 54. On "reduced CSD's access to inventory and failed to provide transparent explanations regarding changes in distribution strategy." *Id.* ¶ 55. CSD produced the retailer list in December 2021 and a

supplemental retailer list in May 2022. *Id.* ¶ 57. Rather than using the retailer list for its stated purpose of supporting CSD's distribution operations, On then began directly contacting the retailers on the list. *Id.* ¶¶ 58, 59.

In January 2023, On notified CSD that it was terminating the business relationship effective January 1, 2023. *Id.* ¶ 61. In that notice, On represented that it would continue accepting orders from CSD through June 1, 2023 and would fulfill orders through June 30, 2023. *Id.* ¶ 62. During the wind-down period, CSD placed additional orders with On, continuing to service its retailers in reliance on On's representations that it did not intend to sell directly to those retailers. *Id.* ¶¶ 64, 65. On accepted those orders and continued shipping inventory to CSD, including shipments after June 2023. *Id.* ¶ 66. But during that same period, On also began selling directly to CSD's retailers. *Id.* ¶ 67. As a result, CSD was left with substantial unsold inventory. *Id.* ¶ 68.  Upon termination of the parties' business relationship, On retained CSD's retailer list and the Puerto Rican market. *Id.* ¶¶ 69, 70.

On March 11, 2026, CSD filed its Counterclaim against On, alleging (i) Breach of Implied Contract (Count I), (ii) Breach of Implied Covenant of Good Faith and Fair Dealing (Count II), (iii) Tortious Interference with Business Relationships (Count III), (iv) Unjust Enrichment (Count IV), and (v) Promissory Estoppel (Count V). ECF No. [34]. On April 1, 2026, On filed its Motion to Dismiss the Counterclaim, arguing that all of CSD's claims are "attempts to state the existence of an exclusive distribution agreement without any alleged evidence," and certain of the claims are barred by the statute of limitations. ECF No. [36] at 7. CSD responds that it has "plausibly allege[d] a straightforward course of misconduct: On leveraged its relationship with CSD to obtain access to CSD's retailer network and proprietary information, only to use that access to displace CSD and capture the very business CSD developed." ECF No. [37] ¶ 1.

## II.    LEGAL STANDARD

When ruling on a Rule 12(b)(6) motion to dismiss, a court generally focuses on the complaint itself. *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("A court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss."). Federal Rule of Civil Procedure 8(a)(2) requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not impose a requirement of "detailed factual allegations," but it does demand "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive an attack by a Rule 12(b)(6) motion to dismiss, a complaint must therefore contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). But a complaint may proceed if it contains "enough factual matter (taken as true) to suggest" the elements of the stated claims. *Twombly*, 550 U.S. at 556.

In evaluating the complaint, a court accepts as true the plaintiff's factual allegations and any reasonable inferences drawn from those facts. *Martins v. Royal Caribbean Cruises Ltd.*, 174 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) (citing *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). A court need not accept the plaintiff's legal conclusions as true. *Iqbal*, 556 U.S. at 679. And while a court makes reasonable inferences in the plaintiff's favor, it need not make the same inferences as the plaintiff nor accept "unwarranted deductions of fact." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting *S. Fla. Water Dist. Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996)).

9

Although a court primarily considers only facts contained within the four corners of the complaint when ruling on a motion to dismiss, the court may consider additional documents when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

## III.    DISCUSSION

### A.    CSD's Motion to Dismiss the Complaint

#### i.    Breach of Implied-in-Fact Contract

CSD argues, first, that On's breach of implied-in-fact contract claim fails as a matter of law because On does not and cannot allege the existence of a valid contract during the relevant time period, as no contract existed after January 1, 2023. ECF No. [31] ¶¶ 20–22.  Second, CSD argues, to the extent On argues that a second implied-in-fact contract was formed after January 1, 2023, On's "conduct is contrary to the offer it claims created an implied-in-fact contract"—that is, it is contrary to the unexecuted Terms of Service Agreement and to On's verbal notices. *Id.* ¶ 23–25. Where On's "own actions directly contradict the terms of the offer it invokes as the basis for an implied-in-fact contract," its breach of contract claim must fail. *Id.* ¶ 26.

On responds that an implied-in-fact contract existed between On and CSD at all relevant times. ECF No. [32] at 5–6. That is, it was within the parties' course of dealing that the grace period occurred—during which CSD placed orders for inventory, On supplied the inventory, and On issued the invoices at issue. *Id.* at 6. CSD, On argues, misstates (i) misstates the applicable legal standard for a breach of implied-in-fact contract claim, (ii) overlooks On's repeated

allegations as to the date of the invoiced orders, and (iii) misreads both the Terms of Service Agreement and the First Amended Complaint as to the nature of the contract. *Id.* at 6–8.

CSD replies, first, that On's allegations and attached termination notice establish that the parties' distributor relationship ended on January 1, 2023, meaning On's actions after that point were "unilateral accommodation and credit risk-taking," not evidence of mutual assent. ECF No. [33] ¶ 3. Second, On's attempts to avoid the Terms of Service Agreement shows that On has not alleged a definite contract or "enforceable essential terms." *Id.* ¶ 5. Moreover, CSD argues, "a course of dealing theory cannot substitute for pleading a contract when On's own allegations show the relevant terms were not consistently followed and that On's conduct during the wind-down was contrary to the 'no release while delinquent' rule On claims governed reorders." *Id*.

As a general matter, a breach of contract is plausibly alleged where the complaint alleges facts sufficient to establish the existence of a contract, a material breach, and resulting damages. *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008). Under Florida law, "a contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997). That is, unlike express contracts, which arise when the parties' assent is manifested through written or spoken words, an implied-in-fact contract is "inferred in whole or in part from the parties' conduct." *Id.* at 385. "In these contracts, the parties have in fact entered into an agreement but without sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999). "While the law will not recognize an implied-in-fact contract where an express contract exists, a contract may be inferred where an express contract fails for lack of

proof." *Baron v. Osman*, 39 So. 3d 449, 451 (Fla. 5th DCA 2010) (citing *Quayside Assocs., Ltd. v. Triefler*, 506 So.2d 6, 7 (Fla. 3d DCA 1987)).

Here, the Court finds that On has adequately alleged the existence of an implied-in-fact contract based on a combination of the parties' words and conduct. On alleges that beginning in 2015, it entered into a business relationship pursuant to which CSD would place orders for On-branded products, On would fulfill those orders, On would issue an invoice for payment, and CSD would pay for the inventory. ECF No. [25] ¶ 17. On provided notice of termination of the parties' agreement on January 1, 2023 but provided a "grace period" during which On would "remain committed to taking and fulfilling [CSD's] orders through June 30, 2023." *Id.* ¶ 27; ECF No. [25-5] at 2. The parties' conduct, as alleged by On, evinces the existence of an implied-in-fact contract continuing through June 30, 2023, as CSD continued to place orders which were fulfilled by On, and On subsequently issued invoices for those orders. ECF No. [25] ¶ 32. Indeed, the allegation that CSD "made numerous payments to On for inventory that it purchased during the . . . grace period through June 30, 2023" is highly probative of the matter. *Id.* ¶ 34. In short, the parties' conduct, as alleged by On, sufficiently demonstrates mutual assent to a business relationship according to which On would provide inventory and CSD would provide payment. The contours of the mutual promises are clear.

CSD's arguments to the contrary are unavailing. That On provided notice of termination does not undermine that it, *in the same notice*, described the arrangement continuing until June 30, 2023. ECF No. [25-5] at 2. It also does not undermine that the parties, in the absence of an express agreement, continued behaving in alignment with their previous course of conduct during that grace period. That payment was received *after* inventory was shipped rather than before is irrelevant and does not negate the existence of an implied-in-fact contract where the parties'

conduct clearly implies the existence of mutual promises—here, to provide inventory and to pay for the inventory, respectively. On does not allege that the Terms of Service Agreement governed the parties' relationship or that it represented a formal "offer;" indeed, On was clear that the document merely "generally although not always" set forth how the parties interacted with one another and went unexecuted. ECF No. [25] ¶ 17.

For those reasons, CSD's Motion is denied with respect to CSD's claim for breach of implied-in-fact contract.

### ii. Account Stated

CSD next argues that On's account stated claim also fails because, first, On does not and cannot "allege that the parties reached an express agreement as to the amounts purportedly due," as CSD disputed whether the asserted amounts were actually owed. ECF No. [31] ¶ 29. Second, less than one month after On sent the September 2023 Account Statement, CSD "voiced an objection, expressed concerns with [On]'s bad faith conduct, and asserted affirmative claims for damages against Plaintiff." *Id.* ¶ 31. "Without mutual assent to the correctness of the account and in light of Defendant's timely response and asserted affirmative claims against [On], [On] cannot establish an account stated claim under Florida law and the claim should be dismissed with prejudice." *Id.* ¶ 35.

On responds that it has alternatively alleged a claim for account stated. ECF No. [32] at 8. On contends that it has adequately alleged a "practice of periodic billings for certain amounts in the regular course of business." *Id.* at 9 (citations omitted). CSD did not object to the amount owed and instead made repeated promises to pay the amount due. *Id*. Fundamentally, On argues that "CSD's lack of timely objection to the invoices and its progress payments toward the amounts due

demonstrate its agreement to the amounts." *Id*. Any affirmative claims against On are unrelated. *Id*.

CSD replies that "Florida law requires an agreement that a stated amount is correct and owing, together with an express or implied promise to pay," which On cannot show, because CSD "timely objected to the September 2023 Account Statement, disputed liability, and asserted affirmative claims against Plaintiff." ECF No. [33] ¶ 6.

"For an account stated to exist, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance." *First Union Discount Brokerage Services, Inc. v. Milos*, 997 F.2d 835, 841 (11th Cir. 1993) (quoting *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992)). "[T]he practice of periodic billing in the regular course of dealing may establish an account stated if no objection to the amount of the bill is made within a reasonable time." *FDIC v. Brodie*, 602 So. 2d 1358, 1361 (Fla. 3rd DCA 1992).

The Court finds that On should be permitted to proceed with its account stated claim in the alternative. On alleged that it had a practice of periodically sending CSD invoices for inventory sold and shipped during their business relationship. ECF No. [25] ¶¶ 17 ("Typically, upon placing an order for inventory, On would issue an Invoice to CSD for payment."), 20 ("The Parties' business relationship and compensation structure was based on CSD placing orders for inventory from On and On issuing Invoices to CSD for those inventory purchases."). On issued invoices for products purchased and shipped during the grace period. *Id*. ¶¶ 32–34. According to On's allegations, CSD paid some of those invoices, bringing the balance due from approximately $400,000 at the conclusion of the grace period to the $166,622.04 due today. *Id*. ¶¶ 1, 33. Those

14

allegations are sufficient to claim a practice of periodic billing, of which the invoices at issue were a part.

And On has sufficiently alleged that CSD did not timely object to the amount due or the fact of that amount being owed. For instance, On alleges that on March 4, 2024—in response to On inquiring about when payment would be made on the issued invoices—Veronica Rosario of CSD wrote to Blake Baker of On, stating, in relevant part:

> We sincerely apologize for any inconvenience caused by the delay in payment. Rest assured we remain committed to resolving this matter in a timely and responsible manner. As previously mentioned, we encountered significant difficulties last year, which unfortunately impacted our ability to address our financial obligations promptly. . . . Currently, we are actively addressing our financial situation and prioritizing the settlement of outstanding debts, including the balance owed to On Inc.

*Id.* ¶ 34; ECF No. [25-2] at 40. Nothing in this response represents an objection to the invoice—either in terms of the amount due or the fact of it being owed.

CSD's arguments to the contrary are unavailing. CSD argues that its October 2023 email raising issues with On allegedly working with former CSD clients constitutes an objection to the invoices at issue here. ECF No. [25-2] at 40. At the motion to dismiss stage, and taking all inferences in the light most favorable to On, the Court cannot say that this is the case. Nothing in the email mentions the invoices at all, much less raises an objection to the invoices.

The same is true with respect to the March 2024 email from CSD to On. *Id*. That email clearly states that CSD is "prioritizing the settlement of outstanding debts, including the balance owed to [On]." *Id*. That email plainly only referenced the October 2023 email "[t]o provide context" regarding the "impact[s on CSD's] ability to address [its] financial obligations promptly." *Id*. At the very least, the Court cannot say that this represents a dispute of the amount due or the fact of it being owed.

15

Even the July 2024 email—sent nearly a year after the invoices at issue were sent—is amenable to being interpreted in On's favor. For one, the email clarifies that CSD was asserting affirmative claims against On, but the email does not dispute "the past amount due of $166,622.04." ECF No. [25-2] at 55. Moreover, it is not at all clear that an email sent nearly a year after the invoices were conveyed represents a "timely" objection.

The cases cited by CSD do not support its argument. In *AT&T Corp. v. Bahamas Tourist Office*, the court dismissed the account stated claim because there was no allegation that (i) "the parties reached an agreement that the amount is correct and due" *or* (ii) that a practice of periodic billing existed in the regular course of dealing with no reasonably timely objection. No. 04-60249-CIV, 2005 WL 8155320, at *7 (S.D. Fla. Aug. 17, 2005). In the context of the court's opinion, *either* of these allegations would have sufficed. Here, On has amply stated a claim for account stated in terms of the latter formulation. Thus, *AT&T* does not compel a result contrary to the one the Court reaches here.

Similarly, *PSS World Medical, Inc. v. Greenway Medical Technologies, Inc.*, does not change the Court's analysis. There, the plaintiff did not follow the procedure required to receive payment and breached the agreement prior to consummation of the relevant transactions. No. 3:09-CV-1019, 2011 WL 13295370, at *7 (M.D. Fla. Jan. 10, 2011). For one, unlike *PSS World*, CSD's communications here can reasonably be read as assenting to the amount due and the fact of it being owed, rendering *PSS World* entirely inapt. Moreover, CSD makes no allegations of the sort raised in *PSS World*. As On correctly points out, CSD makes no argument "that CSD did not request the shoes, that On did not deliver the shoes, or that there was a breach by On of any requirement in the implied contract between the parties that was necessary before CSD would pay for the shoes." ECF No. [32] at 12. CSD, in effect, makes no allegations pertinent to its payment obligations and

16

instead raises claims regarding On's post-grace period actions. This, too, makes *PSS World* inapposite.

Thus, On is permitted to proceed on its account stated claim, and CSD's Motion to Dismiss the Complaint is denied as to that claim.

### iii.    Conversion

CSD argues that On's conversion claim fails for three primary reasons. ECF No. [31] ¶ 36. First, On "does not allege that it made a [pre-litigation] demand on [CSD] to return the inventory in question and Defendant refused, or why a demand would be futile." *Id*. Second, On "cannot allege the requisite wrongful taking intent for a conversion claim because it voluntarily and knowingly shipped inventory to [CSD]." *Id*. ¶ 36. Third, and finally, On "inappropriately attempts to re-package its purported breach of contract claim as conversion." *Id*. ¶ 36.

On responds that it has stated a claim for conversion in the alternative. On alleged that CSD obtained the shoes through affirmative misrepresentations about its intention to pay. ECF No. [32] at 13. "When CSD failed to pay the outstanding amounts despite repeated promises, its continued possession of the On products became unauthorized and wrongful, and On's right to immediate possession attached." *Id*. On specifically stated that CSD could return the unsold inventory. *Id*. Still, CSD retained possession and control that were inconsistent with On's ownership rights. *Id*.

Responding specifically to CSD's arguments, On argues, first, that a demand for return of the converted property is not an element of conversion. *Id.* at 14. Second, On contends that where consent to possession is obtained by fraud, a plaintiff can still recover for conversion even if the plaintiff is aware of transferring possession. *Id.* at 15. Third, On alleges that its conversion claim seeks relief from a different aspect of the same incident relative to its breach of contract claim; the

conversion claim argues that, in the absence of a contract—which CSD alleges did not exist—CSD obtained products through affirmative misrepresentations. *Id.* at 16.

CSD replies, first, that a pre-suit demand for return of the inventory (or an allegation that a demand would have been futile) constitutes a necessary element of a conversion claim. ECF No. [33] ¶ 10. Moreover, On cannot "establish an unauthorized or wrongful taking, as it voluntarily and knowingly shipped the goods to Defendant" after terminating the business relationship. *Id*. Finally, CSD argues that those allegations "sound in contract and fail to establish wrongful dominion independent of that dispute," the conversion claim should be dismissed with prejudice. *Id*.

Conversion is an "unauthorized act which deprives another of his property permanently or for an indefinite period of time." *Indus. Park Dev. Corp. v. Am. Express Bank, FSB*, 960 F. Supp. 2d 1363, 1366 (S.D. Fla. 2013) (quoting *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001)). Thus, "in order to state a claim of conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Id.* (citing *Edwards v. Landsman*, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011)).

Under Florida law, "a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft.*" Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (citing Fla. Desk, Inc. v. Mitchell Int'l, Inc., 817 So. 2d 1059, 1060 (Fla. 5th DCA 2002); *W.C.P.S. of Fla., Inc. v. Standard Brands of Am.*, 707 So. 2d 416 (Fla. 4th DCA 1998); *Rosen v. Marlin*, 486 So. 2d 623, 626 (Fla. 3d DCA 1986)). The only circumstance in which parties in privity of contract may recover on a conversion claim is if the conversion "go[es] beyond" and is "independent from, a failure to comply with the terms of a contract." *Gasparini*, 972 So. 2d at 1055–56 (citing *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645

18

So. 2d 490, 495 (Fla. 3d DCA 1994); *see also 1021018 Alberta Ltd. v. Netpaying, Inc.*, 2011 WL 1103635, at *4 (M.D. Fla. Mar. 24, 2011) ("[A] claim for conversion may lie even where a contractual relationship exists between the parties if the alleged conversion exists independently of an alleged failure to perform contractual duties."). If such independence is not alleged, "[t]he Eleventh Circuit and Florida courts have consistently held that a conversion action is not an appropriate means of vindicating a claim which essentially alleges breach of contract." *Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 838 (11th Cir. 1988) (citing *Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.*, 777 F.2d 1504, 1507 (11th Cir. 1985)).

Here, the Court finds that On's claim for conversion cannot proceed. While On is correct that a demand for return is not, in general, necessary for a conversion claim, *see Goodrich v. Malowney*, 157 So.2d 829, 832 (Fla. 2d DCA 1963) ("The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."), in the particular case where the original taking was lawful, the Eleventh Circuit and Florida courts have indicated that a demand is necessary. *Ranger v. Wells Fargo Bank N.A.*, 757 F. App'x 896, 905 (11th Cir. 2018) ("Thus, while a plaintiff need not always allege a demand, '[i]f the original taking is lawful, the withholding being the wrongful element, a demand is necessary . . ..'") (quoting *Mullenmaster v. Newbern*, 679 So.2d 1186, 1186 (Fla. 4th DCA 1996))); *see also Tulepan v. Roberts*, No. 14-CV-80574, 2015 WL 235441, at *5 (S.D. Fla. Jan. 16, 2015) ("Where an owner gives another permission to take possession of his property, he must terminate that permission by requesting return of the property before continued possession by the non-owner will constitute a conversion."). Here, On does not allege that it demanded a return of the inventory, even where all the allegations in the Amended Complaint indicate that CSD

"lawfully came into possession of the" inventory. *Ranger*, 757 F. App'x at 905. Indeed, On's Response appears to concede as much, merely arguing that a demand is not a necessary element of conversion. ECF No. [32] at 14. For this reason, On's conversion claim must be dismissed.[1]

### iv.      Unjust Enrichment

CSD argues that On's unjust enrichment claim fails "because courts are clear that equity does not reward self-created risk." ECF No. [31] ¶ 42. Specifically, "equity does not permit recovery where a sophisticated commercial party knowingly disregards its own stated conditions, voluntarily ships goods despite acknowledged delinquency, and assumes the risk of nonpayment." *Id.* ¶ 44 (citations omitted). Moreover, CSD argues that the unjust enrichment claim also fails because it "merely repackages a breach of contract claim and seeks recovery of the same defined sum," which is not permitted under Florida law. *Id.* ¶ 45 (citations omitted).

On responds that it properly pled unjust enrichment in the alternative. ECF No. [32] at 16. It alleges that it conferred "substantial and direct benefits" on CSD, which CSD accepted knowing that On expected to be paid. *Id.* To the extent it is determined that there is no implied-in-fact contract, a claim for unjust enrichment would be warranted. *Id.* at 17. Moreover, On rejects CSD's argument that this is a case of "bad credit decisions," stating that it is "bizarre" for CSD to argue that "On should have known that it could not trust CSD to pay for the inventory it requested." *Id.*

CSD replies that the unjust enrichment claim fails, first, because this "is a straightforward commercial dispute, not an equitable case." ECF No. [33] ¶ 15. "Having knowingly extended further credit [where CSD had failed to meet conditions precedent], On cannot now invoke equity to undo the commercial risk it chose to take." *Id.* Second, CSD argues the economic loss doctrine

---

[1] Because the Court finds dismissal warranted on the above ground, the Court does not reach CSD's arguments that On's conversion claim must fail where the inventory was given over "voluntarily and knowingly" or because it duplicates the breach of contract claim. ECF No. [31].

bars the claim, because "On alleges no independent injury, no separate property damage, and no distinct equitable harm." *Id.* ¶ 16. Finally, CSD contends that "[e]quity does not rescue a sophisticated party from the consequences of its own business accommodations or credit practices." *Id.* ¶ 17.

The elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *American Marine Tech, Inc. v. World Grp. Yachting, Inc.*, 418 F. Supp. 3d 1075, 1083 (S.D. Fla. 2019) (quoting *Hercules, Inc. v. Pages*, 814 F. Supp. 79, 80 (M.D. Fla. 1993)). "[T]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy." *Id.* (quoting *Gary v. D. Agustini & Asociados, S.A.*, 865 F. Supp. 818, 827 (S.D. Fla. 1994)); *see also Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1326 (S.D. Fla. 2000).

In general, a party may only recover under an unjust enrichment theory where there is no valid contract, be it express or implied-in-fact. *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011) (citing *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1226–27 (S.D. Fla. 2010)). Still, "unjust enrichment and breach of contract may be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid." *Gibson v. Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1344 (S.D. Fla. 2020) (collecting cases). That is, courts within this circuit often find it premature to dismiss an unjust enrichment claim at the motion to dismiss stage where an undisputed contract has yet to be established. *See Raven v. Lincoln Nat. Life Ins. Co.*, No. 07-23137-CIV, 2011 WL 5553837, at *7 (S.D. Fla. Nov. 15, 2011) ("It is only upon a showing that an express contract exists

21

that the unjust enrichment . . . count fails.") (internal quotation marks and citation omitted); *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013) ("[I]t is not upon the allegation of the existence of a contract, but upon a showing that an express contract exists that the unjust enrichment count fails."); *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020) (denying motion to dismiss alternative unjust enrichment claim); *Rosado v. Barry Univ. Inc.*, 499 F. Supp. 3d 1152, 1160 (S.D. Fla. 2020) (same); *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316 (S.D. Fla. 2018) (same); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1359 (M.D. Fla. 2021) (same).

Considering this, the Court finds that dismissal of the alternative unjust enrichment claim is not warranted, as it has not been definitively established—and is, disputed—that a contract existed between the parties. On has alleged (1) that it provided CSD with the benefit of substantial inventory, (2) CSD knew of, accepted, and retained that inventory, and (3) it would be inequitable for CSD to retain the amount owed for the inventory. At this stage in the proceedings, these allegations are sufficient to state a plausible claim for unjust enrichment. CSD's argument that CSD should be permitted not to pay for inventory received because On somehow bore the risk of CSD being an untrustworthy business partner is without merit. Thus, CSD's Motion to Dismiss the Complaint is denied with respect to On's unjust enrichment claim.

### B.  On's Motion to Dismiss the Counterclaim

#### i.  Statute of Limitations

On argues that several of CSD's counterclaims— implied-in-fact contract, breach of the implied covenant, unjust enrichment, tortious interference, and promissory estoppel—are barred in whole or in part by the applicable statute of limitations. ECF No. [36] at 3–5.

CSD responds, first, that its counterclaims "arise out of the same transaction or occurrence as On's claims" and are therefore compulsory counterclaims, so "the relevant date for statute of limitations purposes is, at minimum, the filing of the complaint, not the later filing of the counterclaim." ECF No. [36] ¶¶ 8–10. When measured against the Complaint filed on September 24, 2025, all the counterclaims asserted by CSD are timely. *Id.* ¶ 11. Second, CSD argues that the doctrine of recoupment independently preserves the counterclaims because the counterclaims arise from the same transaction or occurrence as On's claims. *Id.* ¶ 14. Third, CSD argues that it has alleged "a continuing course of conduct that extended through the termination of the parties' relationship in 2023 and into the wind-down period." *Id.* ¶ 17. Fourth, CSD argues that dismissal on statute of limitations grounds is inappropriate at the motion to dismiss stage, because it is not apparent from the face of the Counterclaim that the counterclaims are time-barred. *Id.* ¶ 21.

On replies, first, that CSD's counterclaims are permissive, not compulsory, because they share a general relationship but not the same facts; therefore, they do not toll the statute of limitations. ECF No. [40] at 1–2. Second, recoupment does not apply because CSD's counterclaims do not arise out of the same transaction as On's claims. *Id.* at 2–3. Third, CSD's delayed discovery argument is inapplicable, as the doctrine is narrowly limited to circumstances not present here, and delayed discovery does not apply to contract, unjust enrichment, or tortious interference. *Id.* at 3. Fourth, the continuing torts theory does not apply because CSD alleges discrete acts, which do not form a continuing tort. *Id.* at 3–4. Finally, the face of the Counterclaim shows it is untimely, so the claims are due to be dismissed. *Id.* at 4.

Federal Rule of Civil Procedure 13(a) defines a compulsory counterclaim as any claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). The Eleventh Circuit uses the "logical relationship" test for

23

determining whether a counterclaim is compulsory. *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985). "Under this test, there is a logical relationship when 'the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant.'" *Id*. Whether a counterclaim is compulsory is a matter of law. *Id.* at 1454. Importantly, courts adopt a "broad, realistic interpretation" of the compulsory counterclaim rule that allows the rule to accomplish its goal of avoiding duplicative litigation. *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1381 (11th Cir. 1991) (quoting *Stone v. Pembroke Lakes Trailer Park, Inc.*, 268 So.2d 400, 402 (Fla. 4th DCA 1972)).

Many courts in this Circuit find that, as a result of the "relation-back" doctrine embodied in Federal Rules of Civil Procedure 13(a) and 15(c), the filing of a complaint tolls the statute of limitations on any compulsory counterclaims. *See, e.g., Cafe, Gelato & Panini LLC v. Simon Prop. Grp., Inc.*, No. 20-60981-CIV, 2022 WL 17987100, at *2 (S.D. Fla. Aug. 25, 2022); *United Healthcare Servs. Inc. v. Sanctuary Surgical Ctr., Inc.*, No. 10-81589-CIV, 2014 WL 12300314, at *1 (S.D. Fla. Dec. 24, 2014); *Alma-Mater Collections, Inc. v. Crossroads Fin., LLC*, No. 15-81095-CIV-KAM, 2022 WL 18458152, at *5 (S.D. Fla. Sept. 27, 2022); *Blasland, Bouck & Lee, Inc. v. City of Miami*, 283 F.3d 1286, 1300-01 (11th Cir. 2002); *Mayo Clinic Jacksonville v. Alzheimer's Inst. of Am., Inc.*, 683 F. Supp. 2d 1292, 1298 n.8 (M.D. Fla. 2009) (quoting *Bull v. United States*, 295 U.S. 247, 262 (1935)); *Stein v. Feingold*, 629 So. 2d 998, 999 (Fla. 3d DCA 1993); *Allie v. Ionata*, 503 So. 2d 1237, 1239 (Fla. 1987) (citations omitted).

The Court finds that a "logical relationship" exists between On's Amended Complaint and CSD's Counterclaim such that the latter represents a compulsory counterclaim. *Republic Health*

*Corp.*, 755 F.2d at 1455; *Cafe, Gelato & Panini LLC*, 2022 WL 17987100, at *3.[2] Indeed, both involve the same underlying business relationship, and both concern the parties' respective obligations to one another pursuant to that business relationship. The contents of the business relationship—that is, what exactly was required of each party according to the same business relationship—are at issue in both cases. A separate trial on the Counterclaim "'would involve a substantial duplication of effort and time by the parties and the courts,'" because the Amended Complaint and Counterclaim "'are offshoots of the same basic controversy between the parties.'" *Diamond v. Terminal Ry. Ala. State Docks*, 421 F.2d 228, 236 (5th Cir. 1970) (quoting *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961)). Fundamentally, both the Amended Complaint and the Counterclaim arise out of the same transaction, thereby rendering the Counterclaim a compulsory counterclaim under Federal Rule of Civil Procedure 13(a). As a result, the Court also finds that the Counterclaim is timely filed pursuant to the "relation-back" doctrine embodied in Federal Rules of Civil Procedure 13(a) and 15(c).

The Complaint was filed on September 24, 2025, so the relevant question is whether CSD's counterclaims are timely relative to that date. CSD does not dispute that the relevant statute of limitations for its breach of implied-in-fact contract, breach of the implied covenant, unjust

---

[2] It is worth noting that, in establishing the "logical relation" test, the Eleventh Circuit did not require that the parties demonstrate the applicability of other, more restrictive formulations of the compulsory counterclaim test. Specifically, the Court allowed, but did not require, use of any of the following tests:

1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
2) Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

*Plant v. Blazer Fin. Servs., Inc. of Georgia*, 598 F.2d 1357, 1360 (5th Cir. 1979). The question of whether there is any logical relation between the claim and the counterclaim is far less stringent than those alternative formulations. As such, the Court is not persuaded by On's argument about the degree of nexus required for a counterclaim to qualify as compulsory.

enrichment, promissory estoppel, and tortious interference counterclaims is four years under Florida law. Fla. Stats. §§ 95.11(3)(j)–(n). That means that all actions must have occurred after September 24, 2021.

CSD's breach of implied-in-fact contract counterclaim in Count I arises out of actions occurring "[t]oward the end of 2021," ECF No. [34] ¶ 44, and after On received CSD's retailer list in December 2021, *id.* ¶ 57. *See also id.* ¶ 74. The Court cannot say that these actions are time-barred, so On's statute of limitations argument fails as to these claims. CSD's counterclaim for breach of implied covenant in Count II is largely based on the same actions, so the Court cannot say Count II is barred either. Count III for tortious interference is based on On allegedly "contacting and ultimately selling products directly to retailers that has been serviced by CSD." *Id.* ¶ 84. Because these actions allegedly occurred during the timeframes discussed just above, the Court cannot say Count III is time-barred. CSD's promissory estoppel counterclaim in Count V is based on On allegedly "us[ing] the information contained in th[e] retailer list to identify, target, and ultimately convert those same retailers for direct servicing by On." *Id.* ¶ 105. Again, since the retailer list was allegedly first provided in December 2021, Count V does not appear to be time-barred.

Finally, Count IV for unjust enrichment is based on "the value of the developed Puerto Rico market and goodwill" cultivated by CSD "[o]ver nearly a decade." *Id.* ¶¶ 95, 98. This claim appears to fall at least partially outside the statute of limitations. But at the motion to dismiss stage, so long as at least some of the alleged unjust enrichment occurred within the statutory period, dismissal is inappropriate. While the statute of limitations may affect the ultimate damages available to On, dismissal of the unjust enrichment claim on the basis of a statute of limitations would be improper.

### ii.      Breach of Implied-in-Fact Contract

On argues that CSD's breach of implied-in-fact contract counterclaim in Count I should be dismissed because CSD fails to plead a contract and because it is barred by the Statute of Frauds. ECF No. [36] at 5. Specifically, On argues first that CSD does not allege On's actual agreement to exclusive distribution or marketing. *Id.* at 6. Moreover, On argues the counterclaim is barred by the Statute of Frauds, which is "clear from the face of the Counterclaim." *Id.* at 7. This is because the alleged agreement was "not to be performed within the space of one year." *Id.*

CSD responds that the Counterclaim plausibly alleges an implied-in-fact contract. ECF No. [37] ¶ 24. Its allegations support a reasonable inference that the parties mutually agreed, through their conduct, to an exclusive distribution arrangement. *Id.* The Statute of Frauds, CSD argues, does not warrant dismissal, because its "obligations are not inherently incapable of performance within one year." *Id.* ¶ 28. CSD "does not allege a single perpetual or fixed long-term agreement, but rather a course of dealing giving rise to multiple implied obligations," which were "expressly limited in duration and capable of full performance within one year." *Id.* ¶ 31.

On replies, first, that the Counterclaim does not plausibly allege that On agreed to an exclusive distribution arrangement. ECF No. [40] at 4. It does not contain allegations as to the basic terms of any purported exclusive arrangement. *Id.* Second, On argues that any agreement alleged would fail under the Statute of Frauds, as the parties would have undertaken a multi-year relationship. *Id.*

"Under the statute of frauds, any agreement that is not to be performed within the space of one year from its making must be reduced to writing in order to be enforceable." *Rubenstein v. Primedica Healthcare, Inc.*, 755 So.2d 746, 748 (Fla. 4th DCA 2000) (citations omitted). The purpose of the statute of frauds is "to 'intercept the frequency and success of actions based on

27

nothing more than loose verbal statements or mere innuendos.'" *U.S. Distributors, Inc. v. Block*, Case No.: 09-21635-CIV, 2009 WL 3295099, at *5 (S.D. Fla. Oct. 13, 2009) (quoting *Tannenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779 (Fla. 1966)).

In *Browning v. Poirier*, the Supreme Court of Florida explained that, "judging from the time the oral contract of indefinite duration is made, if the contract's full performance is possible within one year from the inception of the contract, then it falls outside the statute of frauds." 165 So. 3d 663, 666 (Fla. 2015) (collecting cases). Cases before and since *Browning* have been clear that "the focus of the statute of frauds is whether the parties[] intended that the parol contract itself was not to be performed within a year." *Loper v. Weather Shield Mfg., Inc.*, 203 So. 3d 898, 906 (Fla. 1st DCA 2015) (citation omitted); *Lundstrom Realty Advisors, Inc. v. Schickedanz Bros.-Riviera Ltd.*, 856 So.2d 1117, 1122 (Fla. 4th DCA 2003) ("When an oral agreement is silent as to time, yet capable of performance within one year, the parties' intent will control to determine whether the statute of frauds bars enforcement."); *Saeme v. Levine*, No. 11-CV-21913, 2012 WL 13134604, at *4 (S.D. Fla. June 12, 2012) ("Florida courts have specifically held that an oral agreement to enter into a new business that will continue indefinitely is barred by the statute of frauds." (collecting cases)), *aff'd*, 502 F. App'x 849 (11th Cir. 2012). Importantly, "an oral contract for an indefinite time is not barred by the Statute of Frauds. Only if a contract could not be performed within one year would it fall within the statute." *Byam v. Klopcich*, 454 So. 2d 720, 721 (Fla. 4th DCA 1984).

Here, the Court finds that CSD has adequately pled the existence of an implied-in-fact contract. CSD alleges that it served as the exclusive distributor for On's products in Puerto Rico for the better part of a decade. ECF No. [34] ¶¶ 7, 27. Indeed, CSD alleges that in 2014, On's cofounder "expressly authorized" CSD to serve the Puerto Rican market and that, "[f]rom the

28

outset, On was aware that Puerto Rico would be served as a defined territory by CSD." *Id.* ¶¶ 25, 26. During the course of the alleged business relationship, CSD "functioned as On's exclusive distributor for Puerto Rico," and "On did not appoint any other distributors in the territory and relied exclusively on CSD." *Id.* ¶¶ 31–33. These facts are sufficient to give rise to an inference of an implied-in-fact contract. On's reference to the lack of allegations that it "committed to exclusive distribution" and other similar points of non-agreement are unavailing, as implied-in-fact contracts are determined in large part by the parties' conduct, rather than their words. *Commerce P'ship 8098 Ltd. P'ship*, 695 So.2d at 386. CSD alleges that On treated CSD as its exclusive distributor in return for CSD's sales efforts. That is sufficient to state a claim at the motion to dismiss stage.

Moreover, the Court finds that it cannot conclusively determine that the Statute of Frauds applies. Nothing in the Counterclaim addresses the intended duration of the alleged implied-in-fact contract, and the mere fact that full performance was not completed within one year from the start of the implied-in-fact contract is not dispositive. *See Browning*, 165 So. 3d at 665–66. Moreover, the Court cannot say, from the facts alleged in the Counterclaim, that full performance within one year was impossible. Indeed, the strongest indication is that the implied-in-fact contract is alleged to have been one of an indefinite duration, which generally does not fall within the Statute of Frauds. *Tews v. Valdeon*, No. 12-23026-CIV, 2013 WL 5333205, at *4 (S.D. Fla. Sept. 23, 2013) (discussing the "clear directive to read contracts for an indefinite time as falling outside the statute of frauds"). At a minimum, the parties' intent as to the duration of the alleged implied-in-fact contract "is a factual matter that cannot be resolved on a motion to dismiss." *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1177 (M.D. Fla. 2005); *see also Hugues v. Priderock Capital Partners, LLC*, 2018 WL 3699348, at *2 (S.D. Fla. May 31, 2018) ("Courts in this district have held that the intent of the parties is a factual inquiry which

29

makes a determination of the applicability of the statute of frauds improper on a motion to dismiss." (collecting cases)). Thus, without further answers as to the intent of the parties, the Court declines to dismiss CSD's counterclaim for breach of implied-in-fact contract on this basis.

### iii. Breach of Implied Covenant

On next argues the CSD's counterclaim for breach of the implied covenant of good faith and faith dealing should be dismissed, first, because it is duplicative of CSD's breach of implied-in-fact contract counterclaim. ECF No. [36] at 10. Specifically, it alleges "the same conduct and the same damages," and claims of that sort cannot survive. *Id.* 11. Second, On argues that a breach of implied covenant counterclaim cannot survive in the absence of "an express contractual term." *Id.*

CSD responds, first, that its breach of implied covenant counterclaim is not duplicative of its breach of implied-in-fact contract counterclaim because it "targets distinct bad-faith conduct in the performance of that relationship, not merely the existence or breach of an agreement." ECF No. [37] ¶ 33. Second, CSD argues that it did plead an accompanying breach-of-contract claim arising from the same contractual relationship and conduct. *Id.* ¶ 36.

On replies that "the allegations confirm that the claim is duplicative of the contract claim," because CSD "identifies no conduct that is wrongful apart from the alleged breach." ECF No. [40] at 6. Second, On argues the claim fails because there is no enforceable contract—that is, no specific contractual provision that conferred discretion upon On and that was exercised in bad faith— meaning there is no baseline obligation against which "bad faith" can be measured. *Id.* at 7.

Florida law recognizes an implied covenant of good faith and fair dealing in every contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999); *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So.2d 1049, 1050 (Fla. 1997). This implied covenant is "a gap-filling default rule

where the terms of the contract vest a party with substantial discretion, requiring that party to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the contract counterparty." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1218 (S.D. Fla. 2015) (citations omitted). It applies "when the propriety of the conduct is not resolved by the express terms of the contract, and its application does not contradict the express terms of the contract." *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1225 (S.D. Fla. 2013) (citations omitted).

Importantly, Florida law requires dismissal of implied covenant claims that are duplicative of claims for express breach of contract. *See, e.g., Enola Contracting Servs., Inc. v. URS Grp., Inc.*, No. 5:08cv2, 2008 WL 1844612, at *3 (N.D. Fla. Apr. 23, 2008) (citations omitted); *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, No. 04-60861-Civ, 2005 WL 975773, at *11 (S.D. Fla. Mar. 4, 2005) (citation omitted). Claims for breach of the implied covenant that "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action" cannot withstand a motion to dismiss under Florida law. *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000).

As an initial matter, the Court does not find the breach of implied covenant counterclaim duplicative of the breach of implied-in-fact contract counterclaim. The two appear to cover different ground. The breach of contract claim focuses on On allegedly selling products directly in Puerto Rico, supplying Foot Locker directly, selling directly to retailers historically serviced by CSD, and circumventing the retailer relationships developed by CSD. ECF No. [34] ¶ 74. By contrast, the breach of implied covenant counterclaim involves other grounds—including On requesting the retailer list under certain representations; using the retailer list; imposing inventory

31

caps, system holds, and supply restrictions while preparing to transition Puerto Rico to direct servicing; and representing that On had no intention of selling directly to CSD's retailers during the wind-down period. *Id.* ¶ 78. Certainly, there is some degree of overlap between the claims, but they are far from coterminous.

Moreover, the Court disagrees with On's contention that CSD did not "connect[] its implied covenant claim to an express contractual term." ECF No. [36] at 12. While CSD did not provide a single sentence to this effect, it is clear from the totality of the Counterclaim—including the breach of implied-in-fact contract counterclaim—that this allegation is tied to the alleged breach of CSD's exclusive distributorship.

The fact that the contract alleged is an implied-in-fact contract rather than an express contract does not change the Court's conclusion, as courts allow implied covenant claims past the motion to dismiss stage even where the claim is based on an implied-in-fact contract. *S. Miami Holdings, LLC v. Fed. Deposit Ins. Corp.*, No. 10-CV-22032-UU, 2011 WL 13220688, at *5 (S.D. Fla. Aug. 1, 2011); *Shaffer v. Bank of New York Mellon*, No. 8:17-CV-565-T-33AAS, 2017 WL 3065222, at *6 (M.D. Fla. July 19, 2017).

### iv. Tortious Interference

On next argues that CSD's tortious interference with business relationships counterclaim should be dismissed because CSD has not alleged (i) actual and identifiable business relationships that were affected, (ii) intentional and unjustified interference beyond mere competition, or (iii) activity beyond the alleged breach of contract such that the independent tort doctrine would not apply. ECF No. [26] at 12–16.

CSD responds, first, that rather than offering "speculative or prospective relationship," it alleged "ongoing, established, and curated business relationships with specific retailers throughout

32

its distribution territory" to whom CSD regularly sold product. ECF No. [37] ¶ 42. CSD need not identify the retailers by name in the pleading; it need only allege relationships that are "ascertainable, existing, and not merely speculative." *Id.* ¶ 44. Second, CSD argues that On did merely compete; it did so through improper methods, which is not a valid exercise of the right to compete. *Id.* ¶¶ 45–49. Finally, the counterclaim is not barred by the independent tort doctrine because the conduct alleged is independent of the contractual breach and requires proof of distinct facts. *Id.* ¶¶ 50–54.

On replies that CSD failed to identify a concrete relationship, merely offering a *post hoc* list of past retailers. ECF No. [40] at 8. Moreover, CSD failed to allege improper methods, as it did not allege a sufficient misrepresentation. *Id*. Finally, On argues the claim is barred by the independent tort doctrine because it is entirely duplicative of the contract theory. *Id*.

Under Florida law, tortious interference with a business relationship is comprised of four elements: "'(1) the existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985)). "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* at 815. Indeed, the Florida Supreme Court has stated that "in order to establish the tort of tortious interference with a business relationship, the plaintiff must prove a business relationship with identifiable customers." *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So.2d 821 (Fla. 1996).

The independent tort doctrine is based on the "fundamental, long-standing common law principle that a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract." *Island Travel & Tours, Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020). A challenged tort "is independent if the plaintiff must prove facts 'separate and distinct from the breach of contract.'" *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1264 (M.D. Fla. 2010) (citation omitted). In addition, the "damages stemming from that [tort] must be independent, separate and distinct from the damages sustained from the contract's breach." *Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. 3d DCA 2017).

The Court finds CSD has adequately pled tortious interference. CSD pointed to actual and identifiable ongoing business relationships contained in its retailer list. A discrete list of clients is far from "a business relationship to the community at large." *Ethan Allen, Inc.*, 647 So.2d at 815 (citation omitted). The Court does not find that, at the pleading stage, CSD was required to identify all clients from its retailer list by name. *See E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv., Inc.*, No. 8:10-CV-1870-T-27AEP, 2011 WL 4343790, at *10 (M.D. Fla. Aug. 10, 2011), *report and recommendation adopted*, No. 8:10-CV-1870-T-27AEP, 2011 WL 3841631 (M.D. Fla. Aug. 30, 2011) (finding "several customers throughout the Southeastern United States" sufficiently identifiable); *Scanz Techs., Inc. v. JewMon Enters.*, LLC, No. 20-22957-cv-Scola, 2021 WL 65466, at *9 (S.D. Fla. Jan. 6, 2021) (finding "numerous business relationships with clients in Florida, located throughout the United States and . . . the world" sufficiently identifiable). The retailer list is a sufficiently circumscribed universe that it is actual and identifiable.

Moreover, the Court cannot say that On's competition privilege applies to bar the claim. True enough, as a general matter, "Florida recognizes a 'privilege of interference.'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (quoting *Wackenhut*

34

*Corp. v. Maimone*, 389 So. 2d 656, 657–58 (Fla. 4th DCA 1980)). That is, a competitor can go after business for itself: "[t]here can be no claim for tortious interference with a business relationship where the action complained of is undertaken to safeguard or promote one's financial or economic interest." *Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) (quoting *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 293 (Fla. 3d DCA 2007)). But this privilege to compete is "qualified," in that it can be overcome in two ways. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001). First, a party can overcome the competition privilege by proving that "the defendant's motive was purely malicious." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). Second, a party can overcome the competition privilege "if improper methods were used." *Id.*; *see also Duty Free Ams.*, 797 F.3d at 1280 (noting that interference is privileged "unless the [claimant] alleges a purely malicious motive divorced from any legitimate competitive economic interest" or "adequately alleges improper methods" (cleaned up)). "[I]mproper methods" include "physical violence, misrepresentations, illegal conduct, [and] threats of illegal conduct." *Duty Free Ams.*, 797 F.3d at 1280 n.9 (cleaned up).

Here, CSD has adequately alleged an improper method—namely, that On misrepresented its reasons for wanting access to CSD's retailer list and ultimately used that retailer list to contact and convert the retailers for On's benefit. *See generally* ECF No. [34]. This is sufficient to overcome the privilege to compete.[3]

---

[3] Several courts have found it "premature" to apply the privilege to compete at the motion to dismiss stage. *de Cortes v. Brickell Inv. Realty, LLC*, 546 F. Supp. 3d 1332, 1345 (S.D. Fla. 2021); *Persaud v. Bank of Am., N.A.*, No. 14-21819-Civ, 2014 WL 4260853, at *15 (S.D. Fla. Aug. 28, 2014) (finding the "privilege argument . . .unavailing on a motion to dismiss" (alteration added)); *Novell v. Bank of Am. Corp.*, No. 14-cv-80672, 2014 WL 7564678, at *8 (S.D. Fla. Dec. 3, 2014) (collecting cases and finding the defendants' privilege argument inappropriate at the motion-to-dismiss stage).

Finally, CSD's tortious interference counterclaim is not barred by the independent tort doctrine. A misrepresentation designed to access CSD's retailer list and subsequent targeting of the retailer list would constitute tortious interference regardless of any contractual agreement between the parties. In that sense, the tort is independent of the breach of contract, because the duty does not arise from the contract. Moreover, CSD would be required to prove additional facts to support its tortious interference claim beyond On merely taking its customers—it would need to show that On did so via a misrepresentation, such that the taking of those customers was unjustified independent of the alleged contract between the parties.

The Court finds that CSD's tortious interference counterclaim can proceed.

### v. Unjust Enrichment

On next argues that CSD's unjust enrichment claim should be dismissed because the parties' relationship is covered by a contract. ECF No. [36] at 17. Specifically, On argues that CSD points to a contract between the parties at the same time that it seeks to recover for unjust enrichment, which is not allowed under Florida law. *Id.* at 18. And any benefits conferred upon On are not unjust. *Id*. CSD responds that its unjust enrichment claim is "not based on [On]'s alleged failure to perform under the parties' distribution relationship," but on "On's wrongful acquisition and retention of the CSD Retailer List and related business intelligence," which was not covered by the contract. ECF No. [37] ¶ 56. On replies that "unjust enrichment is unavailable where a contract governs the same subject matter." ECF No. [40] at 9.

As the Court described above, "an unjust enrichment claim and a breach of contract claim may be plead simultaneously so long as the existence of the contact has not been proven and the parties have not otherwise stipulated to the existence of a contract." *Luv N' Care, Ltd. v. Hakim*, No. 24-CV-22236, 2024 WL 4948976, at *5 (S.D. Fla. Dec. 3, 2024). Here, On expressly disputes

that a contract governed the conduct at issue. As such, although a party may only ultimately recover for unjust enrichment where there is no valid contract, dismissal is premature where there is a dispute regarding the existence of the contract. *See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009) ("Until an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment on these grounds is premature." (quoting *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. 5th DCA 1998))); *McAbee Construction, Inc. v. Textron Aviation Inc.*, Case No. 8:24-cv-01530, 2024 WL 4518557, at *2-3 (M.D. Fla. Oct. 17, 2024) ("It is not upon a plaintiff's 'allegation of the existence of a contract, but upon a showing that an express contract exists that the unjust enrichment count fails.'[ ] Put another way, until Defendant admits there is an express contract between the parties, a motion to dismiss a claim for unjust enrichment on these grounds is premature."); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1359 (M.D. Fla. 2021) ("Where parties dispute the existence of an underlying contract, dismissal of Plaintiff's unjust enrichment claim is premature. [] Even more important, courts consistently allow plaintiffs to allege alternative claims." (internal citation omitted)).

Thus, the Court declines to dismiss CSD's unjust enrichment claim.

### vi. Promissory Estoppel

Finally, On argues CSD's promissory estoppel counterclaim should be dismissed because it is an indefinite promise that is barred by the Statute of Frauds. ECF No. [36] at 19. That is, promissory estoppel does not create an exception to the Statute of Frauds. *Id.* at 20. CSD responds that it is not alleging a long-term contractual obligation, but "a specific promise tied to On's access to and use of the CSD Retailer List." ECF No. [37] ¶¶ 63, 64. On replies that the alleged "promises"

"are precisely the same indefinite, long-term commitments that form the basis of its contract claim." ECF No. [40] at 10. Thus, a writing was required. *Id*.

The Court finds that—for the same reasons discussed in the section addressing CSD's breach of implied-in-fact contract claim—it cannot conclusively determine that the Statute of Frauds applies to bar CSD's claim. It is true that "Florida courts have held that promissory estoppel cannot be used to overcome the statute of frauds." *Gatti as Tr. of Twin Palms, Inc. v. Goodman*, 780 F. App'x 808, 811 (11th Cir. 2019) (citing *DK Arena, Inc. v. EB Acquisitions I*, LLC, 112 So.3d 85 (Fla. 2013)). But where a Court has "unanswered questions concerning the parties' intent," especially at the motion to dismiss stage, "the applicability of the statute of frauds must be resolved in favor of" the party bringing the claim. *Sundius v. DHB Indus., Inc.*, No. 07-61060-CIV, 2008 WL 11399641, at *5 (S.D. Fla. Jan. 9, 2008). Thus, the Court declines to dismiss CSD's promissory estoppel claim.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  CSD's Motion to Dismiss the Complaint, **ECF No. [31]**, is **GRANTED IN PART** and **DENIED IN PART**.

2.  Count III of the Amended Complaint, **ECF No. [25]**, is **DISMISSED WITH PREJUDICE**.

3.  On's Motion to Dismiss the Counterclaim, **ECF No. [36]**, is **DENIED**.

4.  The parties shall file their respective Answers by **June 9, 2026**.

Case No. 25-cv-24416-BLOOM/Elfenbein

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 26, 2026.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

39